FILED
**United States Court of Appeals**
**Tenth Circuit**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**August 12, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

SHAWN WALDEN,

    Plaintiff - Appellant,

v.

THE CITY OF DUNCAN, OKLAHOMA;
CHRISTIAN ARCHER,

    Defendants - Appellees.

No. 25-6153

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:23-CV-01075-PRW)**
_____

Mark Hammons, Hammons, Hurst & Associates, Oklahoma City, Oklahoma, for
Plaintiff-Appellant.

Jeffrey Hendrickson (Robert S. Lafferrandre, Jessica L. Dark, and Jessica James Curtis
with him on the brief), Pierce Couch Hendrickson Baysinger & Green, L.L.P., Oklahoma
City, Oklahoma, for Defendants-Appellees.
_____

Before **HARTZ**, **MATHESON**, and **McHUGH**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Plaintiff Shawn Walden, a member of the Choctaw Tribe, alleges that he was

unlawfully arrested by Officer Christian Archer of the Duncan Police Department

(the DPD). He brought claims against Archer and the City of Duncan (Defendants),

including a claim against Archer under 42 U.S.C. § 1983, which provides a cause of action for "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" against "[e]very person who" acts "under color of any statute, ordinance, regulation, custom, or usage[] of any State." Defendants argue, however, that Archer could not have acted under color of Oklahoma law because that law would not allow a state officer to arrest an Indian for crimes committed on tribal land, as happened here. The district court agreed and granted summary judgment for Defendants.

We hold that the ruling of the district court was based on a misconception of the applicable law. As a state officer, Archer could detain a suspect before conclusively determining whether the suspect was an Indian. On the record before us, we would have to conclude that Archer was acting under color of Oklahoma law when he detained and briefly investigated Walden. And even if at some point his actions became unlawful, he may still have been acting under color of state law. We do not, however, definitively rule on those matters. The only issue before us is whether Archer was entitled to summary judgment, and we hold that he was not. Whether Plaintiff ultimately prevails on the color-of-law element of his claim is a matter for the district court on remand, perhaps after further factual development. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand for further proceedings.

2

## I.    BACKGROUND

### A.    Factual Background

On December 30, 2022, the DPD received a call that a suspicious man was inside the Chisolm Corner Store and had dropped his firearm twice. The store was in Duncan, Oklahoma, and within the jurisdiction of the Chickasaw Nation Tribe (the Tribe). The DPD and the Tribe had an agreement allowing cross-commissioned DPD officers to enforce tribal law in Chickasaw Nation Indian country.

Officer Archer arrived on the scene as Plaintiff was backing out of a parking spot. He arrived in his DPD uniform while driving a DPD car. He was wearing his DPD badge and a DPD body camera. And he was cross-commissioned by the City of Duncan and the Tribe.

Because Archer suspected that Plaintiff was intoxicated, he had Plaintiff perform a field sobriety test. Based on the tests he performed, Archer arrested Plaintiff and read him Oklahoma's Implied Consent Test Request. Archer asked Plaintiff to submit to a blood test "by approved medical personnel under Oklahoma law" and advised Plaintiff that he "may refuse the State's test, but as a consequence [his] driving privileges will be revoked or denied." Aplt. App., Vol II at 255.

Archer interpreted Plaintiff's response as a refusal. He seized a firearm in the vehicle and took Plaintiff to Stephens County Jail, where he was booked on charges of Actual Physical Control in violation of Okla. Stat. tit. 47, § 11-902 (prohibiting an intoxicated person to be in actual physical control of a motor vehicle) and Carrying Firearms While Under the Influence in violation of Okla. Stat. tit. 21, § 1289.9.

While booking Plaintiff, however, officers discovered that he was a member of the Choctaw Tribe. Because Plaintiff was an Indian and the alleged crimes were committed in Indian country, Oklahoma courts lacked criminal jurisdiction. *See Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1004 (10th Cir. 2015) (Gorsuch, J.) (generally "states possess no authority to prosecute Indians for offenses in Indian country" (internal quotation marks omitted)). Archer then filled out a Chickasaw Nation Probable Cause Affidavit, which accused Plaintiff of violations of the Chickasaw Nation Tribal Code. Although the tribal prosecutor filed charges against Plaintiff, the Tribe later dismissed them.

### B.    Procedural History

In November 2023 Plaintiff filed this suit. He alleged that Archer arrested him based on a false contention that he was intoxicated.[1] He raised a federal claim against Archer for false arrest under 42 U.S.C. § 1983[2] and state-law claims against the City for false arrest and unlawful detention under the Oklahoma Governmental Tort Claims Act.

The district court granted Defendants' motions for summary judgment. *See Walden v. City of Duncan*, No. CIV-23-1075-PRW, 2025 WL 2701504, at *1 (W.D. Okla. Sept. 22, 2025). It did not reach the underlying merits of whether there was a

---

[1] At oral argument Plaintiff's counsel described the claim as challenging "only . . . the initial arrest and whether or not there was probable cause." Oral Arg. at 04:23.

[2] Although Plaintiff initially also brought a § 1983 claim against the City, he abandoned that claim in his Response to the City's Motion for Summary Judgment.

false arrest. Instead, it held that Plaintiff failed to overcome § 1983's "jurisdictional bar" because Archer acted under color of *tribal* law, rather than *state* law. *Id.* at *3. And it held, for the same reason, that the state-law claims failed because Archer's actions were "outside the reach of the Oklahoma Governmental Tort Claims Act." *Id.*

## II.    DISCUSSION

"We review the grant of summary judgment de novo." *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015). "We view the facts in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *Id.* "Summary judgment is appropriate only if there is no genuine dispute as to any material fact." *Id.* (internal quotation marks omitted). We consider only whether the evidence in the current record requires a grant of summary judgment for Defendants. We first review the grant of summary judgment on the federal claim before turning to the state-law claims.

### A.    Federal Claim

Plaintiff brought his federal claim under § 1983, which provides:

> Every person who, *under color of any statute, ordinance, regulation, custom, or usage, of any State* . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983 (emphasis added). "As [the statute's] text makes clear, this provision protects against acts attributable to a State." *Lindke v. Freed*, 601 U.S. 187, 194 (2024). Under § 1983, "actions taken under color of a local government's law . . . count as 'state' action." *Id.* at 195 n.1; *see also Martinez v. City of Aurora*,

174 F.4th 745, 754 (10th Cir. 2026) ("[T]he under-color-of-law element [is] also known as the state action requirement" (internal quotation marks omitted)). Section 1983 does not, however, protect against acts "of a private person." *Lindke*, 601 U.S. at 194. And, as relevant for this appeal, "[a] § 1983 action is unavailable for persons alleging deprivation of constitutional rights under color of tribal law." *Burrell v. Armijo*, 456 F.3d 1159, 1174 (10th Cir. 2006) (internal quotation marks omitted).

"In the run-of-the-mill case, state action is easy to spot. Courts do not ordinarily pause to consider whether § 1983 applies to the actions of police officers . . . ." *Lindke*, 601 U.S. at 195. But this case adds a wrinkle. Defendant Archer was cross-commissioned by a municipality and an Indian tribe. If he acted under color of municipal law, he could be a proper defendant under § 1983. But the district court granted summary judgment on the ground that he was not a state actor at the time of the alleged constitutional violation because he was acting as a tribal officer. *See Walden*, 2025 WL 2701504, at *3. We must reverse.

"State action for purposes of § 1983 exists only if an individual (1) possessed actual authority to take a particular action on the state's behalf and (2) purported to exercise that authority." *Martinez*, 174 F.4th at 755 (brackets and internal quotation marks omitted).[3] One need not act *in accordance with* state law to be acting *under color of* state law. "[T]he *misuse* of power, possessed by virtue of state law,

---

[3] The parties' original briefing debated whether apparent authority was sufficient to establish that someone acted under color of law. But they now agree that "apparent authority does not suffice to show state action." *Martinez*, 174 F.4th at 756.

constitutes state action. While the state-action doctrine requires that the State have granted an official the type of authority that he used to violate rights—*e.g.*, the power to arrest—it encompasses cases where his particular action—*e.g.*, an arrest made with excessive force—violated state or federal law." *Lindke*, 601 U.S. at 199–200 (brackets, citations, and internal quotation marks omitted); *see Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982) ("[T]he actions of a state officer who exceeds the limits of his authority constitute state action . . . ").

To resolve this case we examine what actual authority Archer had to act on behalf of the State of Oklahoma.

There is a "complex patchwork of federal, state, and tribal law governing Indian country." *United States v. Bryant*, 579 U.S. 140, 145 (2016) (internal quotation marks omitted). The Supreme Court has held that "[s]tate courts generally have no jurisdiction to try Indians for conduct committed in Indian country." *McGirt v. Oklahoma*, 591 U.S. 894, 898 (2020) (internal quotation marks omitted); *see also id.* at 931–32 (discussing congressionally created exceptions). But they can "prosecute crimes committed by non-Indians . . . in Indian country." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 633 (2022); *see Ross v. Neff*, 905 F.2d 1349, 1353 (10th Cir. 1990) (States can prosecute non-Indian crimes against non-Indians and victimless crimes by non-Indians in Indian country). Likewise, "[t]ribal governments generally lack criminal jurisdiction over non-Indians who commit crimes in Indian country," although a tribe "may enforce [its] criminal laws against Indian defendants." *Bryant*, 579 U.S. at 145, 146 n.4.

7

The view of Defendants, joined by the district court, appears to be that this division of authority to prosecute settles the issue before us. The State could not prosecute Plaintiff, an Indian, for a crime committed in Indian country, so a state officer could not have authority to arrest Plaintiff for such a crime. There is a logic to that conclusion, but the practical consequences are significant. It is certainly acceptable to require the prosecuting authority to decide before trial whether it has jurisdiction, by assessing whether the defendant is an Indian.[4] But how is a law-enforcement officer (state or tribal) supposed to act after deciding that a crime may have been committed when the suspect's Indian status is in question and ultimate prosecution depends on the suspect's status as an Indian or non-Indian?

The Supreme Court confronted this issue in *United States v. Cooley*, 593 U.S. 345 (2021). A tribal officer had approached the defendant parked on the side of a federal highway in Montana that ran through the Crow Reservation. *See id.* at 348. The officer noticed that the driver had "watery, bloodshot eyes," "appeared to be non-native," and had "two semiautomatic rifles lying on the front seat." *Id.* (internal quotation marks omitted). The officer ordered the defendant out of his car, searched him, and, after returning to the defendant's car, discovered drugs. *See id.* The defendant turned out to be non-Indian, so tribal prosecution was prohibited. Concluding that the officer had no authority to detain and search the defendant, the

---

[4] This court, however, has been presented with cases where the issue of Indian status has been vigorously contested, *see, e.g.*, *United States v. Ruiz*, 164 F.4th 1223, 1225 (10th Cir.), *reh'g en banc granted, opinion vacated*, 174 F.4th 1253 (10th Cir. 2026); *United States v. Hatley*, 153 F.4th 1112, 1116 (10th Cir. 2025).

federal district court suppressed the seized evidence, and the Ninth Circuit affirmed. *See id.*

The Supreme Court reversed, holding that tribal officers "ha[ve] authority to detain temporarily and to search a non-Indian on a public right-of-way that runs through an Indian reservation . . . based on a potential violation of state or federal law prior to the suspect's transport to the proper nontribal authorities for prosecution." *Id.* at 347–48. It acknowledged the general rule that tribes "lack inherent sovereign power to exercise criminal jurisdiction over non-Indians." *Id.* at 349–350. But even if criminal jurisdiction rested outside the tribe, tribal officers could still "detain the offender and transport him to the proper authorities." *Id.* at 352 (internal quotation marks omitted). And "ancillary" to that detain-and-transfer power, officers could "search a non-Indian prior to transport." *Id.* To deny tribes this power "would make it difficult for tribes to protect themselves against ongoing threats," contrary to their recognized inherent power in Indian territory over matters affecting "the health or welfare of the Tribe." *Id.* at 351 (internal quotation marks omitted).

The Court recognized that "full tribal jurisdiction" "over the activities of non-Indians on a reservation" would be improper. *Id.* at 352. But the Court's pragmatic approach respected the core interests of each sovereign. In particular, the conduct of the officer in that case would "not subsequently subject [the defendant] to tribal law." *Id.* at 353. The tribal officer's initial investigation of the defendant's violation of the law "protects the public without raising 'similar concerns' of the sort raised in [the

9

Court's] cases limiting tribal authority." *Id.* (quoting and endorsing brief of Solicitor General).

The Court rejected the standards that the Ninth Circuit imposed on tribal officers, further reflecting the importance of pragmatic considerations. The Court said that it had "doubts about the workability of [those] standards," *id.*, writing:

> Those standards require[d] tribal officers first to determine whether a suspect is non-Indian and, if so, allow[ed] temporary detention only if the violation of law [wa]s "apparent." The first requirement, even if limited to asking a single question, would produce an incentive to lie. The second requirement— that the violation of law be "apparent"—introduces a new standard into search and seizure law. Whether, or how, that standard would be met is not obvious. At the same time, because most of those who live on Indian reservations are non-Indians, this problem of interpretation could arise frequently.

*Id.* (citation omitted). Interestingly, the Court rejected the defendant's suggestion that these concerns could be remedied by affording tribes an opportunity to obtain cross-deputization agreements, noting that these agreements can be hard to come by. *See id.* at 354–55.

*Cooley* did not directly address the circumstance we have here, which is the mirror image of that case—the authority of a *state* officer to stop and investigate an *Indian* in Indian territory. But this court has a precedent in that context, a precedent suggesting that the same considerations govern the authority of a state law-enforcement officer in dealing with a suspect who may be Indian. In *Ute Indian Tribe of the Uintah & Ouray Reservation*, 790 F.3d at 1006, we held that state officers can "lawfully" stop a suspect on a highway that runs through tribal land before determining the suspect's tribal membership. Although we followed the lead of a

10

Ninth Circuit opinion that expressed a rather restrictive view of the authority of the officer, those restrictions are, at the very least, called into question by the reversal of its decision in *Cooley*.

Thus, we must reject the ruling by the district court granting Defendants summary judgment on the ground that Archer did not have state authority in detaining and searching Plaintiff. Under the principles of *Cooley*, Archer, exercising his authority as a DPD officer, could stop Plaintiff, detain him while conducting an initial investigation, and then either hold him until the arrival of tribal officers or transport him to tribal authorities.[5] And even if Archer went beyond the permissible bounds of such detention and transportation—for example, by "misus[ing]" his authority, *Lindke*, 601 U.S. at 200—his actions may still have been under color of state law. But because the sole issue on appeal is the propriety of the summary judgment in favor of Defendants, we should not and need not definitively hold that Archer's conduct satisfied the actual-authority element of the color-of-law test. Suffice it to say that on the current record, we must reverse the summary judgment and remand for further proceedings, which may include additional development of the factual context.[6]

---

[5] The record is unclear whether Plaintiff would have been taken to the same jail if he had been arrested on tribal charges. If so, Plaintiff's transportation would have been precisely the same.

[6] We have suggested that officers' subjective beliefs of their authority may be relevant to determining whether they possessed actual state authority. *See Martinez*, 174 F.4th at 759. But Defendants never argue that Archer did not believe that he was exercising state authority.

11

We should, however, briefly discuss the second element required for Archer to act under color of state law. "[T]o constitute state action, an official must not only have state authority—he must also purport to use it." *Lindke*, 601 U.S. at 201. The "appearance and function" of an officer's activity are relevant. *Id.* at 198. Here, Archer was wearing his DPD uniform, driving a DPD car, carrying his DPD badge, and using DPD equipment. He performed field sobriety tests that he was trained to perform by Oklahoma. He read Oklahoma's Implied Consent Test Request, which gave Plaintiff a choice between agreeing to "the State's test" and submitting to a blood test "by approved medical personnel under Oklahoma law" or "refus[ing] the State's test" and having his driving privileges revoked. Aplt. App., Vol. II at 255. After Plaintiff did not agree, Archer filled out a state form seeking the revocation of Plaintiff's driver's license under state law. And, finally, Archer took Plaintiff to county jail where Plaintiff was booked on state-law charges. During this process, Archer never identified himself as a tribal officer or displayed any indicia of tribal authority. Other contrary evidence may appear on remand; but we could not affirm the summary judgment on the alternative ground that the second component of "color of law" was not satisfied.

Finally, we note the possibility that the evidence could support a determination that Archer was acting under color of both tribal law and state law. But it would be premature for us to opine on whether § 1983 would apply in that circumstance.

### B.    State claims

After determining that Plaintiff did not overcome § 1983's "jurisdictional bar," the district court summarily disposed of Plaintiff's state-law claims. *Walden*, 2025 WL 2701504, at *3. We question the relevance of the § 1983 color-of-law analysis to the state-law claims, which turn on whether the political-subdivision employee was "acting within the scope of employment." But in any event, we must reverse and remand for further proceedings the dismissal of the state-law claims because that dismissal was based on the mistaken ruling on the § 1983 claim.

### III.    CONCLUSION

We **REVERSE** the district court's grant of summary judgment in favor of Defendants and **REMAND** for further proceedings consistent with this opinion.

**25-6153,** *Walden v. City of Duncan*

**MATHESON**, Circuit Judge, concurring**:**

I join the majority opinion but write separately to clarify the basis for the district court's subject matter jurisdiction in this § 1983 action.

The district court said Mr. Walden failed to overcome § 1983's "jurisdictional bar." This statement is incorrect. Section 1983's "under color of" state law element does not confer federal court jurisdiction.[1] Instead, federal courts derive subject matter jurisdiction in § 1983 actions from 28 U.S.C. §§ 1343(a)(3) or 1331. The former requires a deprivation "under color of" state law. The latter does not.

As explained below, because Mr. Walden's complaint relied on § 1331 in addition to § 1343(a)(3) for jurisdiction, he did not need to plead and prove "under color of" state law for subject matter jurisdiction, but he must do so to establish § 1983 liability.

**1. Background**

*a. 42 U.S.C. § 1983*

Section 1983 states the substantive requirements to establish a claim under § 1983. It provides:

> Every person who, *under color of* any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

---

[1] *See* 1 Martin A. Schwartz, *Section 1983 Litigation Claims and Defenses* § 1.07[A] (4th ed. Supp. 1 2026) ("Section 1983 itself does not confer subject matter jurisdiction on the federal courts.").

42 U.S.C. § 1983 (emphasis added).  In *Mitchum v. Foster*, 407 U.S. 225 (1972), the

Supreme Court said Congress enacted § 1983 in 1871 to enforce Fourteenth Amendment

protections against state action.  *Id.* at 238-39.

Section 1983 sets forth the elements to establish liability, not federal court

jurisdiction.  The "under color of" state law element ensures that § 1983 liability falls

within Congress's Section 5 power to enforce the Fourteenth Amendment's substantive

protections.  *See United States v. Morrison*, 529 U.S. 598, 621 (2000) ("Foremost among

these limitations [on Section 5 power] is the time-honored principle that the Fourteenth

Amendment, by its very terms, prohibits only state action."); *Kulick v. Pocono Downs*

*Racing Ass'n*, 816 F.2d 895, 898 (3d Cir. 1987) ("[T]he state action requirement of a

§ 1983 claim constitutes a basis for Congress to regulate conduct pursuant to § 5 of the

Fourteenth Amendment.").[2]

In most § 1983 actions, "under color of" state law serves a function akin to a

federal statute's interstate commerce element that ensures its application falls within

---

[2] "Most [§ 1983] decisions tend to treat the color-of-state-law and state action requirements as one and the same."  1A Schwartz, *supra* note 1, at § 5.10 (4th ed. Supp. 2 2023); *see NCAA v. Tarkanian*, 488 U.S. 179, 182 n.4 (1988) (treating Fourteenth Amendment state action and § 1983 "under color of" state law as "equivalent"); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) (holding that conduct that is state action under the Fourteenth Amendment is also conduct under color of state law under § 1983).  When a § 1983 claim alleges a violation of constitutional rights (e.g., the Thirteenth Amendment) or federal statutory rights that do not have a state action requirement, the plaintiff would still need to satisfy § 1983's "under color of" state law requirement.

Congress's Commerce Clause power. *See United States v. Lopez*, 514 U.S. 549, 561 (1995) (stating that jurisdictional elements "ensure, through case-by-case inquiry, that the [conduct] in question affects interstate commerce"). Section 1983's "under color of" state law must be pled and proved whether the action is brought in federal or state court. *See Maine v. Thiboutot*, 448 U.S. 1, 10-11 (1980) (holding that "§ 1983 actions may be brought in state court").

> b. *28 U.S.C. §§ 1343(a)(3) and 1331*

Sections 1343(a)(3) and 1331 are subject matter jurisdiction-granting statutes.

Section 1343(a)(3) provides that district courts have original jurisdiction over any action "[t]o redress the deprivation, *under color of any State law*, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States." 28 U.S.C. § 1343(a)(3) (emphasis added).

Section 1331, the general federal question jurisdiction statute, provides: "The district courts shall have original jurisdiction of all civil actions *arising under the Constitution, laws, or treaties of the United States*." 28 U.S.C. § 1331 (emphasis added). It does not include an "under color of" state law requirement.

These statutes developed in parallel during the late 19th century. Section 1343(a)(3), the jurisdictional companion to § 1983, originated in the Civil Rights Act of 1866. *Lynch v. Household Fin. Corp.*, 405 U.S. 538, 545 (1972). In 1875, Congress enacted the forerunner of § 1331, giving "the federal courts jurisdiction of all

3

suits of a civil nature at common law or in equity . . . arising under the Constitution or laws of the United States." *Id.* at 546 (quotations omitted). But unlike § 1343, "this general federal-question provision . . . required that a minimum amount in controversy be alleged and proved." *Id.*

The Supreme Court recognized the "apparent conflict between" § 1331 and § 1343 "that a broad reading of § 1343(3) to include all rights secured by the Constitution would render § 1331, and its amount-in-controversy requirement, superfluous." *Id.* at 546-47. The Court harmonized the apparent conflict by noting that "Section 1343(3) applies only to alleged infringements of rights *under 'color of . . . State law*,' whereas § 1331 contains *no such requirement*." *Id.* at 547 (emphasis added).

Civil rights suits asserting jurisdiction under § 1343(a)(3) therefore needed to plead and prove state action to establish subject matter jurisdiction. *See Monks v. Hetherington*, 573 F.2d 1164, 1167 (10th Cir. 1978) ("There is no demonstration of state action and, therefore, no basis for civil rights jurisdiction in the case at bar."). But § 1331 did not require state action for subject matter jurisdiction.

Against this backdrop, the Supreme Court decided *Polk County v. Dodson*, 454 U.S. 312 (1981), stating that "under color of state law" was "a jurisdictional requisite for a § 1983 action." *Id.* at 315. In that case, "[t]he complaint [was] brought under 42 U.S.C. § 1983, and jurisdiction [was] predicated upon 28 U.S.C. § 1343." *Dodson v. Polk County*, 483 F. Supp. 347, 348 (S.D. Iowa 1979). State action under § 1343(a)(3) was necessary for the federal court's subject matter jurisdiction. *See also West v. Atkins*, 487 U.S. 42, 46 (1988) (referring to action "under color of state law," as "a jurisdictional

4

requisite for a § 1983 action"); Brief for the Respondent, *West v. Atkins*, 487 U.S. 42 (1988) (No. 87-5096), 1988 WL 1026278, at *2 ("The case involves 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343.").

In 1980, Congress removed the amount-in-controversy requirement for federal question jurisdiction under § 1331. *See* Pub. L. No. 96-486, § 2(a), 94 Stat. 2369 (1980). Now, most § 1983 claims are brought under both § 1331 and § 1343(a)(3). *See, e.g.*, *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1094 (10th Cir. 2017) ("The complaint . . . relied on 28 U.S.C. § 1331 and § 1343 as the jurisdictional basis for its civil rights claim."). So long as the case "aris[es] under the Constitution, laws, or treaties of the United States," federal district courts have subject matter jurisdiction. 28 U.S.C. § 1331.

Thus, when a § 1983 complaint asserts jurisdiction under § 1331, with or without § 1343(a)(3), the case "arises under" federal law and proof of deprivation "under color of" state law is not necessary for subject matter jurisdiction. The plaintiff still must prove "under color of" state law as an element of a § 1983 claim. *Elliott v. Chrysler Fin.*, 149 F. App'x 766, 768 (10th Cir. 2005) (unpublished) (cited for persuasive value under Fed. R. App. P. 32.1; 10th Cir. R. 32.1) ("Ordinarily, § 1983 plaintiffs assert federal question jurisdiction under 28 U.S.C. § 1331, and the state action requirement is treated only as an element of the claim.").

## 2.  Application

In his § 1983 complaint, Mr. Walden asserted subject matter jurisdiction under 28 U.S.C. §§ 1343(a)(3) and 1331.  The district court found that Mr. Walden failed to

overcome § 1983's "jurisdictional bar."  But Mr. Walden does not need to prove "under

color of" state law to establish subject matter jurisdiction because, under § 1331, his

claim "aris[es] under" § 1983.[3]  He does need to prove "under color of" state law to

establish § 1983 liability on the merits.

As noted, § 1343(a)(3) requires a deprivation "under color of" state law for subject

matter jurisdiction.  But because § 1331 does not include a state action requirement for

federal jurisdiction, state action need not be proved for federal court jurisdiction in a

§ 1983 case when the complaint alleges jurisdiction under § 1331.  Further, whether the

plaintiff relies on § 1343(a)(3), § 1331, or both, proof of "under color of" state law is still

an element of a § 1983 claim.  *See Elliott*, 149 F. App'x. at 768-69.

The district court in Mr. Walden's case had subject matter jurisdiction under

§ 1331 because his § 1983 claim arises under federal law, so any failure by Officer

Archer to act "under color of" state law would not be a subject matter jurisdiction bar but

instead would defeat the § 1983 claim on the merits.

---

[3] "Normally, there is little difficulty in establishing federal court subject matter jurisdiction over § 1983 claims because the federal district courts have subject matter jurisdiction over all § 1983 claims under the general federal question statute, 28 U.S.C. § 1331, or alternatively under § 1343(a)(3)." 1 Schwartz, *supra* note 1, § 1.07[A] (4th ed. Supp. 1 2026).